Filed 10/30/24  P. v. Whyte CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061893 |
| v. | (Super. Ct. No. 20HF0930) |
| PHILIP DOUGLAS WHYTE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Andre Manssourian, Judge. Affirmed with directions.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Philip Douglas Whyte of first degree murder of his spouse.[1] (Pen. Code, § 187, subd. (a); all undesignated references are to this code.) The jury also found a firearm allegation to be true (§ 12022.53, subd. (d)). The trial court imposed an indeterminate term of 25 years to life for the first degree murder conviction and a consecutive term of 25 years to life for the firearm enhancement.

On appeal, Whyte argues prosecutorial and trial court error. He also contends his sentence constitutes cruel and/or unusual punishment under the state and federal Constitutions and that the trial court abused its discretion by failing to strike or dismiss a firearm enhancement. Whyte further argues the trial court's sentencing minutes and abstract of judgment must be corrected to reflect its oral pronouncement of judgment.[2] We agree the sentencing minutes and abstract of judgment must be corrected, but we reject Whyte's other contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

THE INFORMATION

In March 2021, the prosecution filed an information, charging Whyte with first degree murder of his spouse Cindy. (§ 187, subd. (a).) The prosecution further alleged Whyte "personally discharged a firearm

---

[1] To distinguish appellant from the victim, we refer to appellant as Whyte and the victim as Cindy. No disrespect is intended.

[2] We use the term prosecutorial error rather than prosecutorial misconduct because prosecutorial misconduct "'is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667, (*Centeno*).) "'A more apt description . . . is prosecutorial error.'" (*Id.* at p. 667.)

proximately causing . . . death." (§ 12022.53, subd. (d).) Whyte pleaded not guilty and denied the firearm allegation. The case proceeded to trial.

II.

THE EVIDENCE AT TRIAL

*A. Prosecution's Case-in-Chief*

Whyte and Cindy married in 2002. In April 2020, Cindy moved out and began to stay at a local hotel. The hotel's front office manager became acquainted with Cindy while she stayed there. Cindy told the manager she "just left her husband and she didn't want . . . him to know where she was staying." The manager recalled Whyte calling the hotel multiple times a day and asking for Cindy. In several conversations, Cindy showed the manager her cell phone which "would just be going off" with numerous text messages and calls. The manager believed Cindy was scared and hesitant to call the police regarding Whyte.

According to the manager, Cindy worked remotely in her room the first two weeks at the hotel. She then started going to the office a couple of times a week, using a ride-hailing service. In May 2020, Whyte began to pick her up at the hotel and drive her to work. The manager testified Cindy was depleting her financial resources and had no other choice but to rely on Whyte for transportation.

Sometimes, Whyte came to the hotel with groceries, a meal, and some of Cindy's belongings. Their exchanges were short. He dropped off items daily in the two weeks before Whyte shot and killed Cindy.

3

In June 2020, several people witnessed Whyte shoot and kill Cindy.[3] A professional photographer testified he heard a woman scream from across the street while he was taking photographs. He saw a man approach the woman and once the man was approximately 10 to 13 feet away from the woman, the man shot the woman three times with a dark semiautomatic handgun.

An office worker, who was working in a building nearby, testified he heard a gunshot. He recalled the shots were fired "fairly quick." He said there was a brief pause after the first shot. He saw Cindy standing but stumbling. He witnessed Whyte fire a few more shots at Cindy, and she fell to the ground. Whyte went to his car and tossed the gun under it or in the backseat. Whyte did not check on Cindy. The office worker later saw Whyte "mulling around the scene with his phone."

A different office worker, who was working on the second floor of a building nearby, testified hearing two gunshots and seeing a man with a gun standing over a woman on the ground. He saw the man walk to his car with a gun and walk back without one. He thought the man appeared calm.

A general manager of a hotel across the street called 9-1-1. He reported seeing "an African American gentleman" shoot "a woman point blank" with a small gun.

Another individual also called 9-1-1. He reported hearing two or three gunshots and seeing a woman lying on the ground from outside his

---

[3] Two videos, taken from nearby businesses, capture the shooting from a distance. A video taken from the hotel shows Cindy, before the shooting, entering and exiting the hotel; it also shows Whyte, after the shooting, entering and exiting the hotel. All three videos were played for the jury.

office. He said "it just sounded like she got shot two to three times point blank," and she appeared deceased.

Law enforcement arrived at the scene and asked Whyte whether he had any weapons on him. Whyte replied, "'No. The gun is in the car.'" Later, a deputy sheriff saw a semiautomatic handgun protruding from an open backpack in the backseat of Whyte's car.

Other deputies rendered aid to Cindy, who was lying on the ground in the parking lot in a pool of blood. She died at the hospital from three gunshot wounds.

An Orange County Crime Lab forensic scientist retrieved a firearm from a backpack in the backseat of Whyte's car. The firearm was unsafe and set to fire with a bullet in the chamber. Three casings and two bullets were also recovered from the ground in the parking lot.

During a warranted search of Whyte's apartment, investigators found hollow-point ammunition. Seven rounds were missing.

B. *The Defense's Case*

Whyte testified he met Cindy in Trinidad in 1999. While they were living together, Cindy admitted to Whyte she was unfaithful. Nevertheless, the couple married in 2002 and moved to Florida. Cindy started coming home late after drinking, creating tension in the relationship. One day, because she was going out without disclosing her destination, Whyte let the air out of the tires of her car. She moved out. Whyte was heartbroken. Someone reported him as suicidal, and he was hospitalized against his will for a week. Whyte and Cindy then reconciled but still had marital issues.

Whyte testified that, in March 2020, while living in California, Cindy returned home from Trinidad, "[m]ore distan[t] than she'd ever been in

the relationship." A few days after they had sex, Whyte learned he had herpes. In April 2020, he confronted her and "got up in her face" because he suspected she had sex with her ex-boyfriend in Trinidad. He questioned how he contracted herpes and pressed her to test for herpes. She refused. After their argument, she called the police. Cindy moved out and said she was planning to stay at a hotel. Whyte attempted to find her by hacking her e-mail account. In May 2020, she disclosed to him where she was staying.

Whyte testified, before the pandemic shutdown in 2020, his business was doing well, but business dried up during the shutdown. He applied for and received food stamps. His landlord was threatening to evict him for failing to pay rent. One of his clients sent him $500 to pay his cell phone bill. He testified he struggled to comprehend "all the losses." His wife's moving out exacerbated his situation. In May 2020, he attempted to commit suicide by taking oxycodone but failed. He continued considering suicide, and contacted counselors for help.

Whyte wrote a history of his relationship with Cindy. He left this document in his car and his apartment and distributed it to Cindy, her family, and colleagues. At the end of this history, he wrote, "'Cindy will paint a picture that I'm crazy and none of this has ever transpired, but believe what you may, I have never experienced loving someone this way, but here I am.'" He attached a few documents to this history, including his herpes lab results, passwords, and names of his children.

Whyte testified he purchased a gun in May 2020 to kill himself. He also bought ammunition. When he received the gun on June 2, 2020, he placed it in his mouth, to his head, and on his chest, but he "couldn't pull the trigger." On June 4 or 5, 2020, he packed his gun in a backpack and put it in the car. He called Cindy, "begging her" to explain what was happening. He

6

then drove to a trail where he decided he would shoot himself, but he could not pull the trigger. He returned home and left the backpack with the gun inside the car.

On June 4, 2020, Whyte texted a friend, "'I'll deal with God on the other side. I will take her out and end it. I'm done.'" The next day, he texted the friend, "'I'm still alive. She never showed.'"

On June 6, 2020, Whyte texted Cindy, "'I need to know the plan. You gave me this STD, and I'm not going to disappear. My life is ruined.'" The following day, he texted her several times, including the following messages: "'You have destroyed my life and you coldly look at me with no regard for my feelings, OMG'"; "'You don't have to worry about me. God will deal with you'"; "'I will live with the herpes. I'm not going to jail over you'"; "'If I want, I could see you at your job, anywhere you are. I'll find you. But it's not worth it. You are not worth it. Someone else will take care of you'"; "'I can't believe you said you were scared of me. I've done nothing to you but scream at you for attention. You are scared because you know what you were doing and once I woke up, I'd kick your ass'"; and "'Don't be scared. I can't hurt you. I'm not thinking about that. I'll just wait. Don't be alarmed. I know you'll change hotel in a heartbeat, but I need to speak with you. If you answer the phone or call me, I'll leave.'"

He texted a friend on June 7, 2020: "'Bounce. I'm upside down, dread. Say a prayer for I. This woman is coldhearted. If you hear some shit, I man snapped, rasta.'" Whyte asserted this text message referred to suicide, not murder.

On June 8, 2020, Whyte texted a friend that Cindy was "'hiding'" and he was going to "'put a cap in her ass.'" He added, "'If you read about me

7

in the news, you know what's up.'" Whyte testified he was not being serious in these text messages. The next day, Cindy texted him she wanted a divorce.

Whyte testified he never intended to kill his wife. On June 10, 2020, he set out to return some of Cindy's belongings and to speak with her regarding rent and how to avert eviction. Before he left, while he was loading her belongings in his car, he saw his backpack but did not pay any attention to it.

When he parked his car at the hotel, Cindy came out to talk to him through the car window. Whyte beseeched her to work through their problems and to help him pay rent. They conversed for roughly 20 minutes. But Cindy merely wanted to collect her belongings. She "talked to [him] like [he] was crap," making him feel depressed and suicidal. Whyte wanted to shoot himself.

According to Whyte, Cindy left to grab a luggage cart inside the hotel and returned to the car for her belongings. When he was taking her belongings from the backseat to put them on the cart, Whyte noticed his backpack and remembered he stored his gun in his backpack. As they continued talking, she told Whyte, "'I don't like the way you're talking to me.'" Whyte recalled "a bunch of things [were] said." He decided, "'You know what, screw all of this. It's over. I'm just going to get the gun and shoot myself.'" Whyte testified he was planning to "blow [his] head off in front of her."

When he had the gun, he asked Cindy, "'Are you seeing someone?'" She replied, "'Yes, I'm seeing someone. There's someone waiting on me. And I'll call you on the 19th.'" Whyte explained her response "triggered everything" he was hiding and suppressing throughout their relationship—his emotions, contracting herpes, and his wife's admission that

8

she was seeing someone else. He "ran around the back of the car and pulled the trigger." He testified, "There was no time to contemplate. It was just a reaction."

Whyte did not kill himself afterward because he believed his gun ran out of bullets. He testified he pulled the trigger and nothing happened.

After shooting Cindy, he threw his gun in the car, and it landed in a bag. He was not trying to hide the gun. He thought, "It was the safest place to throw it." He believed she died, so he did not attempt to "console or help her." His "first inclination was to" call 9-1-1. But his cell phone was not connecting to 9-1-1, so he ran into the hotel and screamed, "'Somebody call [9-1-1]. I shot my wife.'"

Whyte ran out of the hotel. By then, Whyte's cell phone connected with 9-1-1, and he screamed, "'I shot my wife. She gave me herpes.'" As he was on the call, the police arrived and arrested him.

*C. Prosecution's Rebuttal Witnesses*

A microbiologist with the Orange County Public Health Lab testified she performed a herpes test on Cindy's body. All three tests were negative. She explained a person with the herpes virus in the dormant phase can test negative.

A range master with the Orange County District Attorney's Office testified Whyte's firearm had a manual safety. It also had an eight-pound trigger pull, meaning a shooter would have to depress eight pounds of pressure to fire.

An Orange County Sheriff's Department investigator testified he interviewed Whyte after reading him his Miranda rights. Whyte told the investigator there was a "written overview of everything that went on in [his] relationship" with Cindy in the back of his car. The document, entitled "'The

9

Life of Michael and Cindy's Relationship,'" was found during a search of Whyte's car.

## III.

### JURY VERDICT AND SENTENCING

The jury found Whyte guilty of first degree murder and the firearm allegation to be true.

Whyte asked the trial court to grant him probation or, in the alternative, sentence him to 25 years to life, with the first degree murder and firearm enhancement sentences served concurrently. At the sentencing hearing, the trial court denied Whyte's probation request under section 1203, subdivision (e). It explained: "To be clear, this Court under no circumstances would find it suitable to give probation to Mr. Whyte. So whether or not he's eligible, this Court is absolutely not going to avail itself of that option."

The trial court considered the mitigating and aggravating factors in the case. As for mitigating factors, the trial court recognized Whyte's record was "relatively minor," a single misdemeanor conviction for carrying a loaded firearm in public in 1994. It also acknowledged Whyte remained at the scene after shooting his wife, called 9-1-1, and admitted to the shooting. As for aggravating factors, the trial court considered "the cold and callous murder of Cindy, his spouse." It concluded "the mitigating circumstances do not offset the aggravating circumstances of the crime." On count 1 (first degree murder), the trial court sentenced Whyte to a term of 25 years to life in prison.

For the firearm enhancement, the trial court emphasized it was "aware of sentencing options in terms of developments in the legislation and the case law in recent years." It explained the jury found true the firearm enhancement allegation under section 12022.53, subdivision (d), and laid out

10

its options to reduce, strike, dismiss, or "not impose it at all." It decided "not to avail itself of any of those options based on the use of the firearm playing the obvious active, important role in the murder." It imposed the section 12022.53, subdivision (d) firearm enhancement consecutive to count 1, resulting in a total term of 50 years to life in prison.

Whyte timely appealed.

## DISCUSSION

### I.

### PROSECUTORIAL ERROR

Whyte argues the prosecutor erred in her closing and rebuttal arguments by misstating the law on first degree murder. In response, the Attorney General argues the prosecutor did not misstate the law. We agree with the Attorney General.

*A. Applicable Law*

"Under state law, "[a] prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct . . . ."'" (*People v. Steskal* (2021) 11 Cal.5th 332, 350.) "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].'" (*Centeno, supra*, 60 Cal.4th at p. 666.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury

11

drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

## B. The Prosecutor's Closing Argument

During closing argument, the prosecutor argued Whyte meticulously planned to kill Cindy. Whyte made clear in writing he intended to kill her, sending text messages saying, "I will put a cap in her ass" and "I'm going to snap. I will take her out. I'm done." The prosecutor pointed to evidence Whyte bought a semiautomatic handgun, drove to the hotel, convinced Cindy to meet him "under the guise of giving her . . . items back," and used that opportunity to shoot and kill her. She referenced Whyte's testimony describing how "for 20 years this woman disrespected him, mistreated him, treated him like a dog, . . . [and] cheated on him." She argued Whyte "knew everything that he felt before he got there." He was "calm" and had "his reason that he decided to kill her." And after shooting Cindy multiple times, the prosecutor argued he calmly walked into the hotel, without bothering to stop to render her aid or even to check on her. When he finally called 9-1-1 to report the shooting, he initially explained that he had shot his wife because she gave him an STD.

The prosecutor also urged the jurors to reject Whyte's explanation that he really intended and planned to kill only himself and that he only turned the gun on Cindy in the heat of passion. The prosecutor argued the fact that Whyte loaded his magazine to its maximum capacity of seven bullets and expended five showed his intent to kill Cindy: a suicidal person would put only one or two bullets in the magazine, not seven. She argued there was no witness or evidence indicating the "gun went anywhere near his head except" Whyte's testimony. She asserted all of the witnesses testified he pointed it at Cindy "'[p]oint-blank'" and not at himself.

12

The prosecutor continued to argue Whyte planned to kill Cindy—he purchased the gun, researched and bought hollow-point bullets, and lured her out of the hotel. But, she argued, even if Whyte did not plan to kill Cindy earlier, he still had time to and did premeditate and deliberate the killing in the couple of minutes before the shooting.

## C. The Prosecutor Did Not Commit Error

Whyte contends it appears the prosecutor argued that, under the doctrine of transferred intent or a theory of "redirected intent," Whyte's intention to kill himself was sufficient to show his intention to kill Cindy. He points to the following statements made by the prosecutor during closing argument.

"Even if you take him at his word, he's guilty of first[ ]degree murder because he already made a decision to kill with the gun: Himself."

"He already decides to get the gun, remembers, takes the gun, makes the decision to kill himself. So that's thinking about killing, grabbing something that works for killing. . . . [H]e's picking up a gun, making the decision to kill himself, and then he just changes his mind on who[m] to kill. [¶] . . . [¶] . . . So even if you want to take his word, he gives you first[ ]degree murder because it doesn't take a lot of time to change your mind on who[m] you're going to kill. 'Oh, no, not me. I'm going to kill her. I don't like what I just heard.' Again, not what happened, based on the facts or his testimony being believable, but even if you believe that."

"He thought and decided in those moments, according to his testimony, to kill himself. That's a decision to kill. He then, according to his testimony, changed the decision on who[m] to kill and redirected it to her, with his testimony. [¶] So even if one of you of the 12 decides, 'I believe his testimony about what happened there,' which it's the People's position is not

reasonable based on the entire comparison and consideration of all the evidence, it's still a first[ ]degree murder. Decision to kill himself, changed his mind, decided to kill Cindy."

"And, again, I get back to the whole point is it really doesn't matter if he intended to kill himself because that intent is an intent to kill. And then it was redirected."

Whyte asserts, because no case law supports such theories, the prosecutor committed error.

Contrary to Whyte's assertion, the prosecutor did not invoke the doctrine of transferred intent.[4] Rather, the prosecutor argued Whyte planned the murder before driving to the hotel and, even if the jury accepted Whyte's account that he intended to commit suicide, he still premeditated and deliberated the killing of Cindy before shooting her.

We agree the manner in which the prosecutor articulated her alternative premeditation argument (if the jurors believed Whyte's claim he only planned to kill himself) was not particularly artful or as clear as it could and should have been. Nevertheless, we must review the prosecutor's argument as a whole. Throughout the prosecutor's closing and rebuttal arguments, the prosecutor contended several times, even if the jury believed Whyte's account that he intended to commit suicide, Whyte changed his mind and decided to kill Cindy. When the prosecutor discussed Whyte "redirecting" his intent to kill—despite the inartful diction—she was referring to Whyte changing his mind about whom to kill. The prosecutor was not arguing, as

---

[4] "[T]he doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder." (*People v. Bland* (2002) 28 Cal.4th 313, 317.)

14

Whyte asserts, premeditation for suicide sufficed to prove premeditation for murder. Therefore, "viewing the challenged statements in context, we find no reasonable likelihood that jurors understood them as defendant asserts." (*People v. Cortez* (2016) 63 Cal.4th 101, 131.)

## II.

### INSTRUCTIONAL ERROR

Whyte argues the trial court committed instructional error because: (1) CALCRIM No. 521 provided an incorrect definition of premeditation; (2) the trial court did not sufficiently instruct the jury on provocation in the context of second degree murder; and (3) the trial court denied Whyte's request for a pinpoint instruction on the objective test for provocation in the context of voluntary manslaughter. We agree the trial court erred by denying Whyte's request for a pinpoint instruction, but conclude the error was harmless. We reject his other arguments.

*A. Applicable Law*

### 1. Standard of Review

"We review claims of instructional error de novo. [Citation.] 'The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." [Citation.]' [Citation.] We assume the jurors are intelligent people and are capable of understanding and correlating the instructions given." (*People v. Ocegueda* (2023) 92 Cal.App.5th 548, 557 (*Ocegueda*).)

### 2. Jury Instructions

"The trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. [Citation.] This sua sponte duty encompasses instructions on lesser included

15

offenses that are supported by the evidence. [Citation.] Additionally, even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly. [Citation.] Once the trial court adequately instructs the jury on the law, it has no duty to give clarifying or amplifying instructions absent a request." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331 (*Hernandez*).)

3. Murder and Provocation

"'First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. [Citation.]' [Citation.] A decision to kill is premeditated if considered beforehand and deliberate if resulting from careful thought and weighing of competing considerations." (*Ocegueda, supra*, 92 Cal.App.5th at p. 557.)

"Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation . . . . [Citation.] To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. [Citation.] If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*Hernandez, supra*, 183 Cal.App.4th at p. 1332.) The test is a subjective one concerning the defendant's mental state. (*Ocegueda, supra*, 92 Cal.App.5th at p. 557.) "Because an instruction on provocation relates to the legal elements of premeditation and deliberation, it is a '"pinpoint instruction"' that a court need not give on its own motion." (*Ibid.*)

"If the provocation that drove the defendant to passion also meets an objective criterion—if it is sufficient to cause a person of average disposition to act rashly and without deliberation—the defendant is deemed

16

to have acted without malice and is guilty only of voluntary manslaughter. [Citation.] That the defendant was subjectively aroused to passion is insufficient to reduce murder to voluntary manslaughter." (*Ocegueda*, *supra*, 92 Cal.App.5th at pp. 557–558.)

*B. Whyte's Challenge to CALCRIM Nos. 521 and 522 Is Preserved for Appeal*

As a preliminary matter, the Attorney General argues Whyte forfeited his challenges to CALCRIM Nos. 521 and 522. Both parties agree defense counsel did not object to or request to modify CALCRIM Nos. 521 or 522. "'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Grimes* (2016) 1 Cal.5th 698, 724.) But "[i]t is well settled that an appellate court may decide an otherwise forfeited claim where the trial court has made an error affecting 'an important issue of constitutional law or a substantial right.'" (*People v. Anderson* (2020) 9 Cal.5th 946, 963.)

Whyte contends the trial court's jury instructions affected his "substantial rights to due process and a fair trial." In determining whether claimed instructional error affects a defendant's substantial rights, an examination of the claim's merits is necessary. (*People v. Jimenez* (2016) 246 Cal.App.4th 726, 730.) If Whyte is correct, such an error would affect his substantial rights, so we find the issue is not forfeited. (See *People v. Mitchell* (2019) 7 Cal.5th 561, 579–580 ["Mitchell claims that the flawed instructions deprived him of due process, and because this would affect his substantial rights if true, his claim is not forfeited"].)

*C. CALCRIM No. 521*

The trial court instructed the jury with CALCRIM No. 521 which, as relevant here, explained a "*defendant acted with premeditation if he*

*decided to kill before committing the act that caused death.* [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (Italics added.)

Whyte argues the language in CALCRIM No. 521—specifically, "[t]he defendant acted with premeditation if he decided to kill before committing the act that caused death"—is inaccurate. He contends the instruction eliminates any distinction between premeditation and the intent to kill, as premeditation entails not merely deciding to kill but also considering in advance. We disagree with this contention.

The California Supreme Court has explained, "'In the context of first degree murder, "'premeditated' means 'considered beforehand.'""" (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.) When reading the jury instruction as a whole, we see no material difference between """"considered beforehand"""" (*ibid.*) and "decided to kill before" (CALCRIM No. 521). CALCRIM No. 521 explicates, "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." This additional language clarifies the definition of premeditation by explaining what is not premeditation. Rather than removing any reflection or planning requirement, CALCRIM No. 521 specifies first degree murder requires the defendant to

18

reflect and consider beforehand. Therefore, CALCRIM No. 521 adequately apprised the jury of the applicable legal principles.

Whyte argues *People v. Bender* (1945) 27 Cal.2d 164 (*Bender*) is analogous. In *Bender*, the trial court instructed the jury a defendant "'can premeditate, that is, think before doing the act, *the moment he conceives the purpose*, as well as if the act were the result of long preconcert or preparation.'" (*Id.* at p. 182.) The California Supreme Court found this instruction to be misleading. (*Id.* at pp. 182–183.) It reasoned "if an act is deliberate and premeditated even though it be executed in the very moment it is conceived, with absolutely 'no appreciable' time for consideration—then it is difficult to see wherein there is any field for the classification of second degree murder." (*Id.* at p. 182.) Our high court found the trial court's instruction "exclude[d] from the required showing any deliberation and premeditation between the intent and the act of killing." (*Id.* at p. 183.) "[S]ince other portions of the instruction eliminate any necessity for deliberation or premeditation in forming the intent . . . ," the trial court had "wholly deleted the only difference, in this type of case, between first and second degree murder." (*Ibid.*)

*Bender* is readily distinguishable from the instant case. Unlike the jury instruction in *Bender*, which effectively removed a showing of premeditation, CALCRIM No. 521 instructs the jury first degree murder requires reflection and consideration before the act. It does not require finding only an intent to kill. Whyte's argument is therefore unavailing.

D. *CALCRIM No. 522*

The trial court provided the standard jury instructions on provocation contained within CALCRIM Nos. 522 and 570. It first instructed the jury on CALCRIM No. 522, the effect of provocation on the degree of

19

murder, followed by CALCRIM No. 570, which covers voluntary manslaughter based on heat of passion. CALCRIM No. 522 sets forth:

"Provocation may reduce a Murder from first degree to second degree and may reduce Murder to Voluntary Manslaughter. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree. Also, consider the provocation in deciding whether the defendant committed Murder or Voluntary Manslaughter."

CALCRIM No. 570 provides in pertinent part: "The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] . . . [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. . . . [¶] It is not enough that the defendant simply was provoked. *The defendant is not allowed to set up his own standard of conduct.* You must decide whether the defendant was provoked and whether the provocation was sufficient. *In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.*" (Italics added.)

We find the trial court committed no instructional error. Viewed in the context of the instructions together, we see no ""reasonable likelihood

20

the jury applied the instruction in an impermissible manner."""[5] (*Ocegueda, supra*, 92 Cal.App.5th at p. 557.) As discussed above, CALCRIM No. 521 accurately instructed the jury on first degree murder. It explains first degree murder requires deliberation and premeditation. (CALCRIM No. 521.) But "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated"—therefore, the killing is not first degree murder but second degree murder. (CALCRIM No. 521.) It does not mention "an objective standard." (*Ocegueda, supra*, 92 Cal.App.5th at p. 558.) Furthermore, CALCRIM No. 522 properly instructed the jury on provocation, providing: "Provocation may reduce a Murder from first degree to second degree and may reduce Murder to Voluntary Manslaughter." And CALCRIM No. 570 correctly instructed the jury that an additional requirement must be satisfied to reduce murder to voluntary manslaughter: "the provocation must meet an objective test." (*Ocegueda, supra*, 92 Cal.App.5th at p. 558.)

Whyte does not dispute the accuracy of CALCRIM Nos. 522 and 570. Rather, he argues the trial court inadequately instructed the jury on provocation in the context of second degree murder. Whyte contends CALCRIM No. 522 implies the standard of provocation is the same in the context of voluntary manslaughter and second degree murder, when they are different: it is an objective standard of provocation for voluntary manslaughter and a subjective standard for second degree murder. He argues the trial court reinforced this erroneous implication, because, immediately after instructing the jury on CALCRIM No. 522, the trial court instructed the

---

[5] "Having adequately instructed the jury on the law, the court was not required to add any clarifying instructions absent a request by" Whyte. (*Ocegueda*, supra, 92 Cal.App.5th at p. 560.) Whyte did not make any request.

jury on CALCRIM No. 570, which barred a defendant from "'set[ting] up his own standard of conduct'" and asked the jury to assess the sufficiency of provocation from the perspective of "'a person of average disposition.'"

These arguments miss the mark. Other appellate courts have rejected nearly identical arguments. In *Ocegueda*, the defendant argued the same jury instructions as those challenged here—CALCRIM Nos. 521, 522, and 570—"might have misled the jury to believe that to reduce murder from first to second degree, provocation must meet the same objective test that leads to a reduction to voluntary manslaughter." (*Ocegueda*, *supra*, 92 Cal.App.5th at p. 558.) The appellate court found no error. It explained the "contention that CALCRIM No. 522 implied a single standard for provocation, with a difference only in 'the amount of provocation,' is illogical." (*Id*. at p. 559.) "'[E]ither an event is sufficiently provocative to cause an ordinary person [of average disposition] to [act impulsively] or it is not.' And as the jury was instructed, if the event was sufficiently provocative to a person of average disposition, and the defendant was subjectively provoked, the defendant is guilty of voluntary manslaughter, not murder. ([Citation]; CALCRIM No. 570.) Under [the defendant's] reading of the instructions, there would be no circumstances under which murder could be reduced from first to second degree based on provocation without being further reduced to manslaughter. Yet CALCRIM No. 522 instructed that provocation could reduce the degree of murder. Thus, the jury would not have understood CALCRIM No. 522 to say that the same standard governed provocation as it

related to both the elements of first degree murder and the heat of passion theory of voluntary manslaughter."[6] (*Ibid.*)

Likewise, in *Hernandez, supra*, 183 Cal.App.4th at p. 1331, the defendant contended CALCRIM No. 522 was "incomplete and misleading," since, inter alia, "it fails to instruct the jury that provocation insufficient for manslaughter may be sufficient for second degree murder." As an initial matter, the court explained "an instruction on provocation for second degree murder is a pinpoint instruction that need not be given sua sponte by the trial court." (*Id.* at p. 1333, citing *People v. Rogers* (2006) 39 Cal.4th 826, 878 (*Rogers*).) Relying on *Rogers*, the *Hernandez* court found "the fact that a trial court is not required to instruct on provocation for second degree murder *at all* supports that it is not misleading to instruct on provocation without explicitly stating that provocation can negate premeditation and deliberation." (*Hernandez, supra*, 183 Cal.App.4th at pp. 1333–1334.) Even though the relevance of provocation is not expressly stated in CALCRIM No. 522, "when the instructions are read as a whole there is no reasonable likelihood the jury did not understand this concept." (*Id.* at p. 1334.)

"In this context, provocation was not used in a technical sense peculiar to the law, and we assume the jurors were aware of the common meaning of the term. [Citation.] Provocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger.' (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 938; see *People v. Ward* (2005) 36 Cal.4th 186, 215 ['provocation . . . is the

---

[6] Similar to *Ocegueda*, in *People v. Jones* (2014) 223 Cal.App.4th 995, 1001, the court concluded CALCRIM Nos. 521, 522, and 570 were accurate instructions on the law.

23

defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state'].) Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1334.) Thus, the "trial court was not required to amplify the instructions to explain this point." (*Ibid.*)

Whyte argues these cases are distinguishable from the instant case. He contends these cases do not address his argument "that provocation in the context of second degree murder has a technical meaning that is peculiar to the law which gives rise to a court's sua sponte duty to provide a clarifying instruction." This argument is unpersuasive. Whyte fails to cite any legal authority in support of the argument. He only argues the technical meaning concerns the effect of "the provocation on the defendant's subjective state of mind," which differs from "the ordinary definition of provocation in a non-homicidal context." As discussed *ante*, *Hernandez* rejected such an argument, and we likewise agree.

*E. Pinpoint Instruction*

Whyte argues the trial court erred by refusing to give a requested pinpoint instruction on the objective standard for provocation. He argues the pinpoint instruction derived from an instruction approved by the California Supreme Court in *People v. Trinh* (2014) 59 Cal.4th 216 (*Trinh*). We conclude the trial court erred, but its error was harmless.

1. Trial Court Proceedings

At trial, Whyte argued he committed voluntary manslaughter, not murder. He contended Cindy provoked him by telling him, "'I am with

24

someone and he is waiting for me. I will call you on the 19th.'" He maintained he acted rashly and under the influence of intense emotion.

During the jury instruction conference, Whyte requested the following pinpoint instruction, citing *Trinh*: "'The question is not whether a reasonable person would have killed the decedent because of the provocation the defendant believed he was under. Rather, the question is whether the provocation was such that a reasonable person would commit any act rashly and from passion rather than judgment as a result of the provocation.'"

The prosecutor argued the proposed pinpoint instruction was "unnecessary and superfluous," as the jury instructions already provided the law. The trial court agreed and denied Whyte's request.

Defense counsel then requested the jury be instructed on the pinpoint instruction in *Trinh*: "'By saying that a defendant is not permitted to set up his own standard of conduct, the court is not instructing you that the question to answer is whether or not a reasonable person would commit the act of killing another because of the provocation that the defendant believed he was under. [¶] Rather the question is whether the provocation was such that a reasonable person would commit any act rashly and from passion rather than judgment because of it.'" (*Trinh, supra*, 59 Cal.4th at p. 232, fn. 3.) The trial court indicated CALCRIM No. 570 is "complete and sufficient to guide the jury" as to voluntary manslaughter. The trial court invited defense counsel to object if she believed the prosecutor made an improper argument.

2. Applicable Law

"'Under appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . .""" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220.) Pinpoint instructions "'relate particular facts to a legal issue in the case or "pinpoint"

25

the crux of a defendant's case.'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) Parties are entitled to legally correct and factually warranted pinpoint instructions, should they request such additional instructions. (*People v. Hughes* (2002) 27 Cal.4th 287, 362.) However, a trial court may properly refuse to give a pinpoint instruction that "incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

In *Trinh*, the California Supreme Court held the trial court erred by denying a requested pinpoint instruction. (59 Cal.4th at p. 233.) The defendant "sought a pinpoint instruction emphasizing that the jury need not find a provocation sufficient to rouse a reasonable person to kill, but only a provocation sufficient to trigger actions out of passion rather than judgment." (*Id.* at pp. 231–232.) The trial court denied it and instructed the jury "with a slightly modified version of CALJIC No. 8.42," the predecessor to CALCRIM No. 570. (*Id.* at p. 232 & fn. 4.)

Our Supreme Court found the requested instruction "accurately reflected the law relating to provocation and heat of passion." (*Trinh*, *supra*, 59 Cal.4th at p. 232.) The requested instruction was not duplicative. The instructions given did not address "whether the provocation must be such as to cause an ordinary person of average disposition merely to act rashly or to kill." (*Id.* at p. 233.) It also was not argumentative. It merely aimed to clarify the law on provocation and focus the jury on the defendant's "theory of the case—that a defendant who was provoked to act rashly by preceding events could have his culpability mitigated—without impermissibly focusing the jury on any particular evidence or demanding favorable inferences from particular facts in the record." (*Ibid.*)

26

3. The Trial Court Erred

The present case resembles *Trinh*. Whyte first requested a pinpoint instruction similar to that in *Trinh* and later proposed *Trinh*'s pinpoint instruction. As in *Trinh*, the instructions given did not specify "whether the provocation must be such as to cause an ordinary person of average disposition merely to act rashly or to kill." (*Trinh*, *supra*, 59 Cal.4th at p. 233.) In *Trinh*, the trial court instructed the jury with a modified CALJIC No. 8.42, which provided in pertinent part: "'The question to be answered is whether or not at the time of the killing the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection and from passion rather than from judgment.'" (*Id.* at p. 232, fn. 4.) Here, the trial court instructed the jury on CALCRIM No. 570, which likewise provided: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." Therefore, the trial court erred by refusing to give the requested pinpoint instruction.

4. The Error Was Harmless

"'The "generally applicable California test for harmless error" is set forth in [*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]. [Citation.] Under the *Watson* test, we deem an error harmless unless it is "reasonably probable" the outcome would have been different in the absence of the error. [Citation.] As a general matter, this test applies to "'"incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error."'" [Citation.]

27

"""In contrast, we evaluate the harmlessness of violations of the federal Constitution under the standard set forth in [*Chapman v. California* (1967)] 386 U.S. 18 [(*Chapman*)]." [Citation.] This "stricter" standard of review requires reversal unless the error is "harmless beyond a reasonable doubt." [Citation.] Among the constitutional errors subject to *Chapman* review is misinstruction of the jury on one or more elements of the offense. [Citations.] This is because the federal Constitution requires "criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" [Citation.] Applying those principles, we have held that *Chapman* review applies to instructional errors that 'misdescribe[ ]' [citation] an element of the charged offense or are otherwise 'incomplete and misleading' [citation] with respect to the findings necessary to prove an element of the offense. [Citation.] The key inquiry is whether the instruction operated to 'preclude[ ] the jury from making a finding' [citation] on any fact necessary to establish an element of the offense. (See [*In re Winship* (1970) 397 U.S. 358, 364] [due process requires prosecution to prove 'beyond a reasonable doubt . . . every fact necessary to constitute the [charged] crime'].)" (*People v. Schuller* (2023) 15 Cal.5th 237, 251 (*Schuller*).)

On the one hand, the Attorney General argues we should review the trial court's denial of a requested pinpoint instruction under *Watson*. On the other hand, Whyte contends we should review the error under *Chapman*. He argues the instructional error violated his constitutional right to argue a complete defense, as the lack of the instruction permitted "the jury to erroneously conclude that [Whyte] had been provoked but such provocation would not cause a reasonable person to kill." He also argues the instructional error eased the prosecution's burden to prove malice and therefore violated

the federal constitution. We need not settle this argument, "because any error here was harmless even under the more stringent *Chapman* standard." (*People v. Franklin* (2018) 21 Cal.App.5th 881, 891 (*Franklin*).)

In *People v. Wharton* (1991) 53 Cal.3d 522, 571 (*Wharton*), the California Supreme Court affirmed a first degree murder conviction where the trial court erred in declining to provide a pinpoint instruction on provocation and heat of passion. The court reasoned "although the jury was not directly instructed that provocation could occur over a 'considerable period of time,' the jury was instructed that a killing is first degree murder if it is 'the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not upon sudden heat of passion.'" (*Id.* at p. 572.) The court concluded: "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." (*Ibid.*)

Here, the trial court's failure to provide the pinpoint instruction could not have prejudiced Whyte. It instructed the jury on first degree murder. (CALCRIM No. 521.) The jury found Whyte's act was premeditated, deliberate, and willful. "This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion." (*Wharton*, *supra*, 53 Cal.3d at p. 572.) Accordingly, "the instructional error was harmless beyond a reasonable doubt." (*People v.*

29

*Speight* (2014) 227 Cal.App.4th 1229, 1246; see also *Franklin*, *supra*, 21 Cal.App.5th at p. 894 [applying *Wharton*].)[7]

## III.

### CUMULATIVE ERROR

Whyte contends the cumulative effect of several errors resulted in a denial of his federal constitutional right to due process and a fair trial. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) That is not the case here. The trial court committed only one recognized error, and it was harmless.

## IV.

### CRUEL AND/OR UNUSUAL PUNISHMENT

Whyte argues his 50-year-to-life sentence for committing first degree murder is cruel and unusual punishment under article 1, section 17 of

---

[7] We note the prosecution and defense counsel's arguments were generally consistent with the requested pinpoint instruction. For example, the prosecutor argued, "Provocation is not evaluated by whether the average person would act in a certain way to kill. Instead, the question is whether the average person would react in a certain way with reason and judgment obscured. Would that statement that he claims have caused someone to act rashly and have no judgment?" Defense counsel contended: "[T]he Court is not going to instruct you that the question to answer is whether or not a reasonable person would commit the act of killing another because of the provocation that the defendant believed he was under. Rather, the question is whether the provocation was such that a reasonable person would commit any act rashly and from passion rather than judgment because of it. [¶] So this isn't asking you would a reasonable person kill Cindy because of being told that there's someone else and that they're waiting for them and they'll call you on the 19th. That's not the standard. Everybody has a different reaction to things. It's saying, 'Would you react impulsively and rashly in this situation?' 'Would a reasonable person do that?'"

the California Constitution and the Eighth Amendment to the federal Constitution. The California Constitution prohibits "cruel or unusual" punishment, and the United States Constitution prohibits "cruel and unusual" punishment. "'The distinction in wording is "purposeful and substantive rather than merely semantic."'" (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).) Therefore, "'we construe the state constitutional provision "separately from its counterpart in the federal Constitution."'" (*Ibid.*) "'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.'" (*People v. Gomez* (2018) 30 Cal.App.5th 493, 499.)

*A. California Constitution*

The California Constitution prohibits "[c]ruel or unusual punishment." (Cal. Const., art. I, § 17.) "[A] sentence will not be found unconstitutional under the California Constitution unless it is so disproportionate to the defendant's crime and circumstances that it shocks the conscience or offends traditional notions of human dignity." (*People v. Perez* (2016) 3 Cal.App.5th 612, 616 (*Perez*).) The California Supreme Court has described three "techniques" to aid in determining whether a sentence is so disproportionate that it is unconstitutional: (1) "examin[ing] the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society"; (2) "compar[ing] the challenged penalty with the punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious"; and (3) "compar[ing] . . . the challenged penalty with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision." (*In re Lynch* (1972) 8 Cal.3d 410, 425–427, italics omitted.)

"'The weight afforded to each prong may vary by case. [Citation.] "Disproportionality need not be established in all three areas."'" (*People v. Wilson* (2020) 56 Cal.App.5th 128, 168 (*Wilson*).) "'A defendant has a considerable burden to overcome when he challenges a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California and the court should not lightly encroach on matters which are uniquely in the domain of the Legislature.'" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296.)

Whyte fails to overcome the considerable burden of establishing his sentence was cruel or unusual. The jury found him guilty of first degree murder, one of "the most grave of offenses." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806.) He used a firearm, a dangerous weapon, to shoot and kill his wife. We cannot "conclude this case is among the rarest of the rare in which the punishment imposed violates article I, section 17 of the California Constitution." (*In re Nunez* (2009) 173 Cal.App.4th 709, 725.)

On appeal, Whyte does not explicitly focus on any of the disproportionality techniques. But he does appear to touch on the nature of the offense and offender. He cites his age, 62 years old, on the day of sentencing and his physical and mental health issues. Moreover, before committing first degree murder, he had only one "relatively minor" conviction related to a firearm on his record. As the trial court recognized, we too acknowledge Whyte did not flee the scene; he called 9-1-1 and confessed to shooting her. Nevertheless, such factors are insufficient to outweigh the seriousness of the first degree murder here. (See, e.g., *Baker, supra*, 20 Cal.App.5th at pp. 724–725 [weighing factors].)

Whyte also contends the sentence was "disproportionate to his offense" and "an excessive and unnecessary penalty that serves no valid

legislative purpose." He argues his sentence is effectively a sentence of life without possibility of parole (LWOP). "[I]t is immaterial that [a] defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution." (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 (*Byrd*).)

In support of his arguments, Whyte relies on a concurring opinion of Justice Mosk in *People v. Deloza* (1998) 18 Cal.4th 585, 600–601 (*Deloza*).[8] But concurring opinions are not binding authority. (*Byrd*, *supra*, 89 Cal.App.4th at p. 1383.) Whyte does not cite any binding authority concluding a sentence surpassing an adult defendant's possible lifespan constitutes cruel or unusual punishment.

B. *Federal Constitution*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." It "contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.'" (*Graham v. Florida* (2010) 560 U.S. 48, 59–60.) "This proportionality principle is narrow when applied in

_____

[8] In his concurrence, Justice Mosk indicated because a sentence of 111 years in prison is "impossible for a human being to serve," it violates the cruel and unusual and cruel or unusual punishment clauses of the federal and state constitutions, respectively. (*Deloza*, *supra*, 18 Cal.4th at pp. 600–601.)

noncapital cases." (*Wilson, supra,* 56 Cal.App.5th at p. 167.) Successful challenges are "'exceedingly rare'" in noncapital cases. (*Ewing v. California* (2003) 538 U.S. 11, 21.)

Considerable overlap exists in the state and federal approaches to cruel and/or unusual punishment. Although slightly different in text, "'both standards prohibit punishment that is "grossly disproportionate" to the crime or the individual culpability of the defendant.' [Citation.] 'The touchstone in each is gross proportionality.'" (*Baker, supra,* 20 Cal.App.5th at p. 733.)

An Eighth Amendment analysis begins with a comparison of "'the gravity of the offense and the severity of the sentence.' [Citation.] 'This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by his conduct, and any prior criminal history.'" (*Baker*, *supra*, 20 Cal.App.5th at p. 733.)

For the same reasons stated in our state constitutional analysis, we conclude Whyte cannot show the sentence violates the Eighth Amendment to the federal Constitution.

V.

FIREARM ENHANCEMENT

*A. Whyte Forfeited His Challenge to the Firearm Enhancement*

On appeal, Whyte argues the trial court abused its discretion by failing to strike or dismiss the section 12022.53, subdivision (d) firearm enhancement. Whyte presents two arguments for the first time on appeal. First, he argues a court must dismiss an enhancement when "[t]he application of an enhancement could result in a sentence of over 20 years" (§ 1385, subd. (c)(2)(C)), unless the court finds such a dismissal "would endanger public safety" (§ 1385, subd. (c)(2)). He asserts the trial court did

34

not find dismissal of the enhancement would endanger public safety. Second, Whyte argues his offense was connected to mental illness under section 1385, subdivision (c)(2)(D), a mitigating circumstance "weigh[ing] greatly in favor of dismissing the enhancement." (§ 1385, subd. (c)(2).) The Attorney General contends Whyte forfeited these arguments because he failed to move to strike or dismiss the firearm enhancement in the trial court. We conclude Whyte forfeited these arguments.

"'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial. [Citation.] The rule applies to "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons" [citation], but the rule does not apply when the sentence is legally unauthorized [citation].'" (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1101 (*Sperling*).)

The forfeiture rule exists to ensure fairness and efficiency by allowing the trial court in the first instance to correct or avoid errors raised by a party. (*Sperling*, *supra*, 12 Cal.App.5th at p. 1101.) The rule also allows the opposing party an opportunity to address an objection with the trial court and prevents a party from "'"engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error." [Citation.]'" (*Ibid.*) "'Had [appellant] timely and specifically objected below, the trial court presumably would have had an opportunity to correct, and could have corrected, any error. [Citation.]'" (*Ibid.*)

In his reply brief, Whyte contends he preserved his challenge because he requested the trial court to impose a sentence of 25 years to life. He argues the trial court would have had to strike or dismiss the firearm enhancement to impose such a sentence. This argument misses the mark. Whyte "is complaining 'about the manner in which the trial court exercise[d] its sentencing discretion and articulate[d] its supporting reasons . . . .' (*People v. Scott* [(1994)] 9 Cal.4th [331,] 356 [(*Scott*)].) *Scott* held that such a complaint 'cannot be raised for the first time on appeal.' (*Ibid.*) Thus, a defendant cannot remain mute while the trial court states its reasons for imposing a sentence and then on appeal claim that its statement of reasons was defective." (*Sperling*, *supra*, 12 Cal.App.5th at p. 1101.)

"'[C]ounsel is charged with understanding, advocating, and clarifying permissible sentencing choices *at the hearing*. Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention.' [Citation.] '[B]y encouraging counsel to intervene *at the time sentencing choices are made*, we hope to reduce the number of issues raised in the reviewing court in *any* form.' [Citation.]

"'[T]he *Scott* rule applies when the trial court "clearly apprise[s]" the parties "of the sentence the court intends to impose and the reasons that support any discretionary choices" [citation], and gives the parties a chance to seek "clarification or change" [citation] by objecting to errors in the sentence. . . . [¶] It is only if the trial court fails to give the parties any meaningful opportunity to object that the *Scott* rule becomes inapplicable.'" (*Sperling*, *supra*, 12 Cal.App.5th at p. 1101.)

Nothing in the record suggests the trial court failed to give the parties a "'meaningful opportunity to object.'" (*Sperling*, *supra*, 12 Cal.App.5th at p. 1101.) At the beginning of the sentencing hearing, the trial

court asked defense counsel if she wanted to make any remarks regarding sentencing. Defense counsel declined and submitted on the sentencing.[9] We therefore conclude Whyte forfeited his challenge to the section 12022.53, subdivision (d) firearm enhancement.

*B. Whyte's Challenge Fails on the Merits*

Even if we were to consider the merits of Whyte's arguments, we would find they fail. Section 12022.53, subdivision (d) provides a person who, in the commission of a specified felony, "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." A "court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (§ 12022.53, subd. (h).)

Section 1385, subdivision (c)(1) sets forth, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so . . . ." Section 1385, subdivision (c)(2) provides, "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove" statutory mitigating circumstances. Two of these mitigating circumstances are relevant in the instant case. First: "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be

---

[9] Whyte also argues the section 12022.53, subdivision (d) firearm enhancement resulted in an unauthorized sentence and that mandatory sentencing rules cannot be forfeited. But, as we discuss in the merits section, there was no unauthorized sentence or mandatory sentencing rules involved here.

37

dismissed." (§ 1385, subd. (c)(2)(C).) Second: "The current offense is connected to mental illness." (§ 1385, (c)(2)(D).)

"Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)

"[N]otwithstanding the presence of a mitigating circumstance, trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of justice" inquiry.'" (*People v. Walker* (2024) 16 Cal.5th 1024, 1033 (*Walker*).) "[A] trial court must 'engage[ ] in a holistic balancing with *special emphasis* on the enumerated mitigating factors,' in which the mitigating factors weigh 'strongly in favor of . . . dismissal.'" (*Id.* at p. 1036.) "[I]f the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in furtherance of justice. This means that, absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.'" (*Ibid.*) We review the trial court's discretionary decision for abuse of discretion. (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116.)

Whyte argues the trial court was required to dismiss the enhancement under section 1385, subdivision (c)(2)(C), because it did not find dismissal of the enhancement would endanger public safety. Indeed, the trial court did not make a finding that dismissal of an enhancement would endanger public safety. Nonetheless, the lack of such a finding is not outcome determinative. The touchstone is "whether dismissal is in furtherance of justice." (*Walker*, *supra*, 16 Cal.5th at p. 1036.)

Here, the trial court found "the mitigating circumstances do not offset the aggravating circumstances," particularly the "cold and callous murder of Cindy, his spouse," and "the use of the firearm" in the murder. (See Cal. Rules of Court, rule 4.421(a)(1) ["The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness"]; Cal. Rules of Court, rule 4.421(a)(2) ["The defendant was armed with or used a weapon at the time of the commission of the crime"].) "Substantial, relevant, and credible evidence" supported these aggravating factors, and they "neutraliz[ed] the 'great weight' of the mitigating circumstances." (*Walker*, *supra*, 16 Cal.5th at p. 1036.) Thus, the trial court properly considered "whether dismissal is in furtherance of justice," despite making no finding that dismissal would endanger public safety. (*Ibid.*)

Whyte also contends another mitigating circumstance, "[t]he current offense is connected to mental illness" (§ 1385, subd. (c)(2)(D)), "'weighs greatly in favor of dismissing the enhancement.'" (§ 1385, subd. (c)(2).) But, as discussed above, the trial court appropriately considered the aggravating and mitigating circumstances.

## THE ABSTRACT OF JUDGMENT AND SENTENCING MINUTES

Whyte contends the abstract of judgment and sentencing minutes conflict with the oral pronouncement of judgment, contain clerical errors, and must be corrected. We agree.

"Generally, a judgment is 'the final determination of the rights of the parties in an action or proceeding.' [Citation.] Rendition of judgment is an oral pronouncement." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1183.) "'Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls.'" (*People v. Clark* (2021) 67 Cal.App.5th 248, 260–261.) "'The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment.'" (*People v. El* (2021) 65 Cal.App.5th 963, 967.) "If the clerk includes fines in the court's minutes or the abstract of judgment that were not part of the oral pronouncement of sentence, those fines must be stricken from the minutes and the abstract of judgment." (*Ibid.*)

Here, at the sentencing hearing, the trial court pronounced: "The Court will waive the various fines and fees that would have been payable through the Department of Corrections because I'm more interested in making sure that restitution is paid." Despite the waiver of fines and fees in the oral pronouncement, both the abstract of judgment and sentencing

minutes include fines and fees under section 1202.4, subdivision (b), section 1202.45, section 1465.8, and Government Code section 70373.[10]

The Attorney General agrees the trial court exercised its discretion to waive the $300 restitution fine under section 1202.4, subdivision (b). But the Attorney General argues the trial court cannot waive mandatory fees, including the suspended $300 parole revocation restitution fine under section 1202.45, the $40 court operations assessment under section 1465.8, and the $30 conviction assessment under Government Code section 70373.

The prosecution failed to object to the trial court's waiver of these fines and fees. The prosecution therefore forfeited any challenge to the trial court's waiver of these fines and fees. (See *People v. Tillman* (2000) 22 Cal.4th 300, 302–303 [when the trial court "failed to state on the record its reasons for not imposing the restitution fines," the People's failure to object to the trial court's omission constituted forfeiture].)

Even if we were to consider the merits of the Attorney General's arguments, we would find they fail. We address the challenged fines and fees in turn. First, section 1202.45, subdivision (a) provides: "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant

_____

[10] The trial court sentencing hearing minutes and the October 13, 2022 abstract of judgment indicate Whyte is ordered to pay the following fines and fees: (1) $300 pursuant to section 1202.4, subdivision (b); (2) $300 under section 1202.45 (suspended unless parole is revoked); (3) $40 court operations fee pursuant to section 1465.8; and (4) $30 under Government Code 70373, subdivision (a)(1). The minutes also reflect the "[c]ourt noted fines and fees will be suspended in order for defendant to work on paying back restitution" and "[c]ourt orders balance of fees/fines [s]uspended." The amended abstract of judgment indicates the "[c]ourt orders balance of fees/fines suspended."

to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine *in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4.*" (Italics added.) Given the trial court waived the restitution fine pursuant to section 1202.4, subdivision (b), "the same amount as that imposed pursuant to subdivision (b) of Section 1202.4" would be $0. (§ 1202.45, subd. (a).) Therefore, by waiving the restitution fine under section 1202.4, subdivision (b), the trial court effectively waived the suspended $300 parole revocation restitution fine under section 1202.45.

Second, section 1465.8, subdivision (a)(1) provides in pertinent part "an assessment of forty dollars ($40) *shall* be imposed on every conviction for a criminal offense . . . ." (Italics added.) Government Code section 70373, subdivision (a)(1) sets forth in relevant part "an assessment *shall* be imposed on every conviction for a criminal offense . . . . The assessment *shall* be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony and in the amount of thirty-five dollars ($35) for each infraction." (Italics added.) Despite these statutes' use of the word "shall," which courts typically interpret as "mandatory" (*Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, 542), recent case law has made section 1465.8 and Government Code section 70373 fees nonmandatory. (See *People v. Duenas* (2019) 30 Cal.App.5th 1157, 1164 [permitting courts to waive section 1465.8 and Government Code section 70373 fees, given a defendant's poverty]; *People v. Kopp* (2019) 38 Cal.App.5th 47, 57, review granted Nov. 13, 2019, S257844 [same].) Accordingly, the Attorney General's argument is unconvincing.

## DISPOSITION

We affirm the judgment. We direct the trial court to delete the following fines and fees from the sentencing minutes and the abstract of judgment dated October 13, 2022: $300 restitution fine (§ 1202.4, subd. (b)), $300 restitution fine (§ 1202.45), $40 court security fee (§ 1465.8), and $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)). The trial court is also ordered to: (1) delete from the sentencing minutes and the abstract of judgment the statements that the court would suspend the balance of fines and fees; and (2) forward a certified copy of the amended sentencing minutes and amended abstract of judgment to the Department of Corrections and Rehabilitation.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


GOODING, J.

43